# The Delaware, Lackawanna & Western R. R. Co., Appellant, v. County Commissioners of Luzerne County, et al.

*Railroads—Grade crossings—Increase of traffic over crossing—Bridges—Act of June 7, 1901, P. L. 531—Equity jurisdiction—Injunction—Retention of bill as precautionary measure.*

1. A bill in equity to restrain the erection of an approach to a county bridge, upon the ground that the erection of the bridge and the approach thereto in the location intended, would require passengers over the bridge to pass over an existing grade crossing of the complainant railroad company, and would, therefore, constitute in effect the creation of a new grade crossing within the meaning of the Act of June 7, 1901, P. L. 531, was held to have been properly dismissed where it appeared that the beginning of the approach complained of, which was on the west bank of the river spanned by the bridge, would be about forty-five feet east of the existing grade crossing.

2. In such a case, the facts that the traffic over the existing crossing would be largely increased by reason of the construction of the bridge and that the danger at the crossing would, therefore, become correspondingly greater, were held to be matters outside of and not affecting the issue.

3. In such a case, however, the court held that, in view of the conceded dangerous condition of the existing crossing and the unquestioned increase of the traffic over it after the construction of the proposed improvement, the bill should be retained as a precautionary measure so as to enable the court to take such proceedings as might be deemed necessary in the future, to insure the safety of travel at the point in question.

Argued April 14, 1913. Appeal, No. 352, Jan. T., 1912, by plaintiff, from decree of C. P. Luzerne Co., In Equity, May T., 1911, No. 6, dismissing bill in case of The Delaware, Lackawanna & Western Railroad Company v. George Smith, Walter M. McAvoy, Silas E. Jones, County Commissioners of Luzerne County; Borough of Plymouth; Penn Bridge Company, Contractor, and M. H. Stebbins, Sub-contractor. Before BROWN,

MESTREZAT, POTTER, ELKIN and MOSCHZISKER, JJ Affirmed.

Bill in equity to restrain the erection of an approach to a county bridge. Before FULLER, P. J.

From the record it appeared that upon petitions filed in the Court of Quarter Sessions proceedings had been instituted for the erection at county expense of a bridge across the Susquehanna river between Hanover Township and Plymouth Borough. After a report by viewers against the bridge, there was a subsequent report by a board of reviewers in favor of the erection thereof, and providing for its northwestern terminus upon Hanover street, in the Borough of Plymouth. The board of reviewers also laid out an approach to the bridge, beginning in the center of Hanover street, in the Borough of Plymouth, at a point forty-five feet from the center of the westbound track of the plaintiff railroad company. The report of the viewers was confirmed and the order for the construction of the bridge and approaches was made. Plaintiff thereupon filed this bill in equity, to restrain the erection of the approach to the bridge, which would compel travelers crossing the bridge to also cross the tracks of the railroad company over an existing grade crossing, claiming that such erection would create a new grade crossing, in violation of the Act of June 7, 1901, P. L. 531.

The trial judge filed an opinion and adjudication, granting the relief prayed for. On exceptions to the adjudication, STRAUSS, J., filed an opinion in part as follows:

The controversy in this case reduces itself to a rather simple question—whether an existing grade crossing over an ancient street, though a narrow one, may be abolished by injunction to restrain the building of the bridge according to plans adopted by the county commissioners, simply because as a result of the bridge the street will in all probability be subjected to larger traffic

than heretofore, and because as a consequence, it might become necessary hereafter to consider whether the street ought not to be widened through proper proceedings in accordance with the statutes in such case made and provided.

The controversy as thus narrowed is fully presented to us by the defendants' eleventh and fourteenth exceptions to the adjudication reported by the trial judge.

We have concluded to sustain both of these exceptions. In presenting the reasons for this action we call attention to the following findings of fact:

The first finding (2) that they (the reviewers) had viewed, laid out and returned for public use the following bridge 26 feet in width and the approaches thereto, to wit: Beginning in the center of Hanover street in the Borough of Plymouth at a point south 17 degrees 31 minutes east 45 feet from the center of the westbound track of the Delaware, Lackawanna and Western Railroad Company; thence by same course along the center of said street 214.7 feet to the northwest end of said bridge, etc.

The fifth finding of fact: "A street formerly known as Mill or Ferry street, now known as Hanover street, has undoubtedly existed in the Borough of Plymouth for upwards of fifty years, antedating even the railroad itself. It turns at right angles from Main street and leads over nearly level ground a distance of 450 feet southeastward to the river where at one time a ferry was maintained now abandoned for some years."

Also the following from the sixth finding of fact: "From the entire body of proof, however, bearing upon this important matter, we find that by prescription a public highway, now known as Hanover street, came to exist, crossing at grade the plaintiff's railroad in the Borough of Plymouth, bounded southerly by the line of what is known as the Kutske property, projecting from Main street to the Susquehanna river, and extending northerly from that line for

a width of not less than 16 feet and perhaps 20 or 25 feet, but we cannot say that any greater width than 16 feet has been established with sufficient certainty to prevail in a controversy respecting the same between the borough and the property owners."

It seems to us that the above findings conclusively establish that no proceedings for the establishment of a new grade crossing is involved. The new bridge, together with the viaduct, will be completed at a point east of the railroad tracks, between those tracks and the Susquehanna river. It will discharge its traffic before reaching the railroad, and that traffic will then have to find its way across the railroad by way of established streets. There is to be no removal of a street from one place of crossing to another as there was in the case of Bogart v. The Penna. Railroad Company. The fact that the bridge is likely to produce additional traffic for the existing streets, does not change the nature of the street or convert an old crossing into a new crossing. That the terminus of the viaduct as planned, does not correspond exactly with the center line of the street which is called for in the report of viewers in consequence of which the bridge was authorized, does not change the fact that the traffic from the bridge will find its way to this street without any interference with the railroad company's business, and without coming to the plaintiff's right of way.

Neither is the quantity of traffic involved here. We may well admit what is reported in the adjudication, viz: that "though less dangerous than some and not more dangerous than many, the crossing is emphatically dangerous even under present conditions on a width of 16 feet with comparatively little travel along the street; so dangerous indeed that a paid watchman has been stationed there by the plaintiff for several years. With the opening of the bridge the amount of travel on foot, in automobiles and in other vehicles crossing the railroad at that point, will be enormously increased and

the danger will become correspondingly greater." But this will be so not because of any added element of danger resulting from a change in physical conformation at the existing street crossing, but because there will be greater use of the street. In other words, the crossing is just as dangerous for each individual who uses it now before the bridge is constructed. No crossing such as this upon a road perfectly level is necessarily dangerous when great caution is exercised by the individual passing over it, and by the railroad company in maintaining watchmen and gates.

But whether an existing crossing is dangerous or not, whether the increased traffic that may through circumstances come to such a crossing makes the probability of serious accident greater or not, are matters with which in this proceeding the court should have no concern. The tendency on our part has been to make it a matter of conscience to prevent this great probability of accident at this crossing, and we find ourselves giving so much importance to that consideration that we are apt to lose sight of the fact that the case must go according to a reasonable construction that shall be given to the Act of June 7, 1901, P. L. 531, in applying it here.

There have been presented to the court by way of evidence several plans for abolishing the grade crossing at this place by submitting an overhead crossing. Each of these plans involves very large expense, the purchase of valuable business real estate, and the building of what will be substantially a bridge several hundred feet long on a down grade from a point over the railroad approaching nearly six per cent., and having two sharp turns, according to one of the plans at right angles, and according to another of the plans at obtuse angles. Neither of the plans provides that this viaduct or bridge shall accommodate all kinds of commercial traffic, for it will not be possible to transport over this viaduct, according to either plan, certain articles having more than usual length like telegraph poles, smokestacks,

boilers, derricks, etc.   The viaduct itself would open upon Main street of Plymouth, which is an active thoroughfare with much traffic but at best a narrow street, having in its middle the tracks of the Wilkes-Barre Company's traction road.   There will be very considerable danger of collision and damages from automobiles and other vehicles entering at the grade named or moving upon this street, even under present conditions, automobile accidents have occurred on this street and the danger will be increased largely by the existence of this new viaduct.

The question therefore resolves itself, so far as the dangerous character of the crossing is concerned into one in which we offset one class of danger against another, and there is no certainty that the new will not be greater than the old.   We ought, therefore, to dismiss all considerations of this kind in an endeavor to ascertain just what the rights of the several parties in this contention are under the existing statute.

In its first section this statute enacts that "hereafter no grade crossing shall be established within the Commonwealth except in cities of the first class, and except as provided in this act."

The third section commands municipalities to construct all new highways across railroads either above or below grade unless permitted in the manner directed by the statute to construct the same at grade, and the cost of the above or below grade construction shall be paid one-half by the municipality and one-half by the railroad company.

The fourth section authorizes railroads and municipalities to make application for permission to construct new grade crossings.

The fifth section authorizes railroad companies at their own cost to abolish existing grade crossings.

In view of the power so granted by the fifth section, it seems to us that the entire tendency of the proceeding now before us, is to relieve the plaintiff from the ob-

ligations of paying the entire expense in abolishing this grade crossing and to place one-half of such expense upon the public, whether the county or the borough, it is not important to answer.

The bill itself does not in any sense seek to restrain any action taken in violation of the Act of 1901. In the first prayer the plaintiff asks this court to restrain the defendant from constructing this "bridge and the viaducts leading therefrom in such manner as will require the highway approach thereto to cross the tracks of the plaintiff's railroad at grade."

Now this is a mere circumlocution from which the court may be expected to infer a fact not to be found from the evidence, viz: that it is purposed to construct "the highway approach to the bridge across the tracks of the plaintiff's railroad." There is no such purpose to be found from the evidence. As we have already pointed out, the viaduct which is part of the bridge construction and provided for in the plan, will be complete before it reaches the railroad. No new highway is to be constructed across the railroad. The traffic, whatever it may be, much or little, must find its way across the railroad over existing highways, and consequently this part of the prayer is really a slightly veiled endeavor to compel judicially but by indirection what the statute has not authorized the courts to do directly, namely, the abolition of the grade crossing already existing in a case where there is no present purpose of making a new grade crossing, and in a manner not authorized by the Act of 1901. There is only one way to abolish an existing grade crossing under that act. That way lies within the power of the railroad company. The railroad company requires no assistance from this court to exercise that power. It is expressly granted by the statute and nothing more is needed than the willingness of the railroad company to pay for the change.

To grant an injunction to restrain the construction of this bridge and its viaducts, except according to

plans which will abolish a grade crossing, is to put a construction upon the Act of 1901, which, in our judgment, is not warranted. In this respect the case differs absolutely and in every detail from Penna. Railroad Company v. Bogert, 209 Pa. 589. It will be found on examining that case when it first appeared in the Supreme Court In re Mifflinville Bridge, 206 Pa. 420, that while there had been somewhere in the neighborhood of the new bridge a grade crossing leading to a ferry, it was proposed as part of the bridge construction to create a new grade crossing at another place, and the county commissioners for that purpose instituted proceedings in the Court of Common Pleas under the Act of 1901. The proceedings resulted in a decree of dismissal on the ground that the Act of 1901 did not apply because the bridge and its approaches at grade had been ordered in consequence of a view under the Act of June 13, 1836, P. L. 551, in a proceeding which had been begun before the Act of 1901 took effect. The appeal was dismissed because while the Supreme Court was of the opinion that the Act of 1901 applied, the case was not before that court in such a way that it would be decided without findings of fact that were still in dispute, the Supreme Court saying:

"Under these circumstances we have thought it best without deciding the other questions, to turn over the appellant to the more plastic and convenient remedy of a bill to enjoin the construction of a bridge in such a manner as to require the highway to cross the railroad at grade."

And in another portion of the opinion saying:

"Under the conceded facts, the crossing involved in this controversy is a new crossing and as such is prohibited by the Act of 1901."

When the equity case thus suggested by the Supreme Court came before that tribunal on appeal, 209 Pa. 589, the language of the opinion in 206 Pa. was reiterated with approval:

"Under the conceded facts the crossing involved in this controversy is a new grade crossing, and as such is prohibited by the Act of 1901. The fact that it is incidental to the relocation of an existing highway under the Act of 1836, does not relieve it of the ban of the Act of 1901. The language of Section 1 of the latter act is 'that all crossings hereafter established shall be above or below grade.' "

Commenting upon its former decision, the latter opinion proceeds:

"This is a new grade crossing. It is true an ancient ferry had a landing a short distance below the bridge and the passengers crossed the tracks, some on foot and some by vehicles, but the contemplated crossing was not only in a different place on the tracks but was intended to accommodate more people. It was in every reasonable sense a new one and not a mere perpetuation of an old one, so that it was fairly within the meaning of the act, a crossing hereafter established, and thereby controlled by the provisions of Act of 1901."

Now the accidental and unnecessary words "but was intended to accommodate more people," have been laid hold of by the plaintiff in the present case as the basis for a judicial declaration that a street established "upwards of fifty years, antedating even the railroad itself" (see fifth finding of fact) may be ignored as an existing crossing, because circumstances and the growth of the community will probably increase the traffic over it. If a private individual were to lay out a piece of land located between the railroad and the river into town lots, and were about to sell those lots for building purposes whereby there would come a large accession of population that would have to use this ancient street crossing at grade, it would be hardly claimed that the railroad company could obtain an injunction to restrain the laying out of the lots, because thereby there will be a larger use of the crossing, and that thus the ancient street crossing would become substantially a new cross-

ing from the circumstances of increased use.   But the building of this bridge is just like the making of any other sort of improvement that comes with the growth of the community.   It is a public necessity so found by a return of the grand jury approved by the court.   It results from the natural growth of the community. The traffic coming over the bridge not being discharged directly upon the railroad but at a point (it matters not whether 45 or 450 feet distant) where it will naturally find its way or come upon an established street, should not have the legal effect of destroying the street and giving the railroad beyond those which it has already for its own protection under the Act of 1901. In other words, this circumstance of communal growth and improvement cannot be serviceable to the railroad company to shift the burden which it has under the statute, from its own shoulders to the public, and to compel the public to pay one-half the cost of abolishing an existing grade crossing.

This, moreover, is in line with numerous decisions since the Act of 1901.   The case of Ligonier Valley Railroad Co. v. Latrobe Borough, 216 Pa. 221, decided that where a street had been established by ordinance and laid out for three years before the Act of 1901 went into effect, although the crossing over the railroad had not really been constructed, an injunction would not lie to restrain the Borough from building it, because as stated in the opinion of the court:

"It is futile to contend that the Act of June 7, 1901, P. L. 531, prohibiting grade crossings except they are allowed by the court, applies here.   The streets of which the grade crossings complained are a part, were established by ordinance and regularly laid out at least three years before the act went into effect.   There is no dispute about this.   The mere fact that up to this time the actual crossings are not what they ought to be to meet public requirements as to convenience, is nothing to the point.   They are none the less established crossings."

And referring to the contention that the crossing would be a dangerous one, the court goes on to say:

"We have again and again reprobated them (grade crossings) and have no disposition to qualify anything that we have said on this general subject. But our disfavor affords no warrant for supposing that when grade crossings have been legally established, public roads with respect to them are to be disregarded."

And in Westover Borough v. Penna. Railroad Co., 35 Pa. Superior Ct. 359, Ligonier Valley R. R. Co. v. Latrobe Borough, 216 Pa. 221, is followed, the court declaring:

"This Act (1901) is not intended to apply to a case where the highway and the railroad company were in actual existence prior to the passage of the act, and it is certainly not the intention of the court to encourage the added risk of additional grade crossings which are to be permitted only in the light of the imperious necessity created by the special location."

So in Erie Railroad Co. v. Dunmore Borough, 10 Lackawanna Jurist, 107, it was held that:

"The right which had been dedicated to the public by the owner before the railroad was built but had been improved by the public only to the railroad company's right of way, might be improved across and beyond the railroad after the Act of 1901, and that the grade crossing in question was established by the plaintiffs as early as 1886 in the construction of a railroad, and as such it has continued to be a public crossing ever since, and that the acts of the borough in improving the crossing amount only to an exercise of its right to improve a public grade crossing in existence before the Act of 1901. That the statute has no application to such a crossing."

The opinion was by Judge Newcomb and cited as authority Ligonier Valley Railroad Company v. Latrobe Borough, 216 Pa. 221.

In Lehigh Valley Railroad Co. v. Laceyville Bridge Company, 23 Pa. C. C. R. 225, the facts were somewhat

similar to those now before us. The right had been dedicated to the public a great many years ago.

The public has used it interruptedly for a very long period of time, some fifty or sixty years or more. A bridge company was about to construct its bridge, and an injunction was applied for to restrain the building of the bridge "so that persons crossing the same shall not cross the plaintiff's road at grade." The learned judge disposing of the case briefly stated:

"As under the evidence the public have now, and always have had, since the plaintiff's road was constructed, the right to cross the same at the point complained of. Now August 7, 1899, this cause came on to be heard, and it is ordered that the injunction heretofore granted is set aside and vacated."

It is true this case was decided prior to the Act of 1901, but it had already been laid down as a principle of equity jurisdiction in this State in Bryner v. Youghiogheny, 190 Pa. 617:

"The courts have not yet been invested with the same authority to regulate grade crossings of railroads over ordinary streets and highways, but the same considerations of safety to life and property, have, in a less imperious degree, required the application of the same general policy, and where, as in the present case, the proposed change is for the purpose or with the effect of avoiding a dangerous crossing of that kind, equity will not enjoin it unless it be clearly and wholly without authority."

And in Pitts. & Lake Erie Railroad Company v. Lawrence County, 198 Pa. 1:

"It must therefore be accepted as the settled policy of the State, as administered by this court, that whenever the subject comes within its jurisdiction and control, no grade crossing of a railroad over another railroad or common highway will be permitted, except in case of manifest and unavoidable necessity."

For these reasons we must sustain the exceptions and dismiss the bill.

Plaintiff appealed.

*Error assigned* was in sustaining the exceptions and dismissing the bill.

*J. H. Oliver,* with him *A. H. McClintock* and *D. R. Reese,* for appellant.

*J. Q. Creveling,* with him *William S. McLean,* County Solicitor, and *Charles Kuschke* and *H. L. Freeman,* for appellees.

OPINION BY MR. JUSTICE MESTREZAT, May 12, 1913:

This case has been exhaustively considered in the majority and minority opinions in the court below and we do not think any extended discussion here would aid in the solution of the questions at issue. The controlling question is whether or not the building of the bridge and viaduct approach thereto requires in effect a new grade crossing at Hanover street, which is prohibited by the Act of Assembly of June 7, 1901, P. L. 531. The question was answered in the affirmative by the trial judge, and in the negative by the court in banc. It is clear, we think, from the facts of the case, disclosed by the evidence, that the construction of the bridge and the viaduct will not result in a new grade crossing in contemplation of the Act of 1901.

Hanover street is an old and well established street, its exact width being uncertain. The court found that it was not less than sixteen feet and perhaps twenty or twenty-five feet. It extends from Main street over the plaintiff's tracks to the Susquehanna river across which the bridge is being constructed. The report of reviewers appointed to locate the bridge fixed the western terminus of the viaduct at a point in the center of Hanover

street forty-five feet east of the center of the west bound track of the plaintiff's railroad. It is clear, therefore, that if the bridge and viaduct are constructed in accordance with the report of reviewers, as confirmed by the court, the viaduct will not cross the plaintiff's railroad tracks, nor will the traffic crossing the bridge be discharged on them. The viaduct will terminate east of the railroad and there discharge the traffic that passes over it. It is argued, however, that the western terminus of the viaduct will not be in Hanover street but will be at least ten feet north of that street and that, therefore, the street must be widened so as to accommodate the traffic which passes over the bridge. Conceding that the terminus of the viaduct will not be in Hanover street (which is denied by the appellees), as contended by appellant, it does not affect the question at issue in this proceeding, which is whether the construction of the bridge and viaduct will require a new grade crossing over the defendant's tracks. The traffic will be discharged at the terminus of the viaduct which, as has been found by the court, will be at least thirty-five feet east of the nearest rail of the plaintiff's switch track. As said by the court it will then have to find its way across the railroad by way of established streets. It is urged, however, that the construction of the bridge will produce additional traffic for the existing streets which must pass through Hanover street and over the crossing of the plaintiff's tracks and will in effect create a new crossing. But this position cannot be sustained. The construction of the bridge undoubtedly will result in increased traffic on Hanover street and across the plaintiff's tracks, but that does not change the character of the crossing, nor convert it from an old to a new crossing within the Act of 1901. The quantity of traffic does not determine the character of the crossing. The present crossing is undoubtedly a dangerous one. It is so regarded by the plaintiff company which has for many years maintained a watchman at the crossing. The

learned court in banc concedes that the traffic will be largely increased by reason of the construction of the bridge, and that the danger will become correspondingly greater, but in its opinion correctly says: "This will be so not because of any added element of danger resulting from a change in physical conformation at the existing street crossing, but because there will be greater use of the street. In other words, the crossing is just as dangerous for each individual who uses it now before the bridge is constructed. No crossing such as this upon a road perfectly level is necessarily dangerous when great caution is exercised by the individual passing over it, and by the railroad company in maintaining watchmen and gates." These are matters, however, as suggested by the court which do not control or rule this case. They are wholly outside and do not affect the issue. They are not sufficient to warrant the court in enjoining the construction of the bridge or the viaduct which has been duly authorized in conformity with law.

While we agree with the court in banc that the plaintiff company is not entitled to enjoin the construction of the bridge and the viaduct because in effect it creates a new grade crossing over the plaintiff's railroad, we think that in view of the conceded dangerous condition of the present crossing and the unquestioned increase of the traffic over it after the construction of the proposed improvement the bill should be retained as a precautionary measure so as to enable the court to take such proceedings as may be deemed necessary in the future to insure, as far as possible, the safety of travel at that point. This will enable the court, upon cause shown, to exercise such control over the crossing as the dangers of the situation may require.

The decree of the court below refusing the injunction prayed for in the bill is affirmed at the costs of the appellant, and it is ordered that the bill be retained for the purposes set forth in the opinion.